THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN A. DILLIARD, Appellant.

404

(Argued May 25, 1936; decided July 8, 1936.)

*I. Gainsburg* and *Joseph P. Segal* for appellant.

*William Copeland Dodge, District Attorney (Lawrence S. Lesser, John P. Walsh* and *Robert S. Rubin* of counsel), for respondent.

HUBBS, J. Appellant has been convicted of a misdemeanor for violating the following statutory provision, section 47 of the Insurance Law (Cons. Laws, ch. 28), which reads:

" Deceptive Statements Prohibited. No insurance corporation doing business in this state, or agent thereof, shall state or represent by advertisement in any newspaper, periodical or magazine, or by any sign, circular, card, policy of insurance or certificate of renewal thereof or otherwise, that any funds or assets are in possession of

any such corporation not actually possessed by it and available for the payment of losses and claims, and held for the protection of its policyholders or creditors."
and section 665, subdivision 3, of the Penal Law:

" Misconduct of directors, officers, agents and employees of Corporations.

"A director, officer, agent or employee of any corporation or joint-stock association who:   *   *   *

" 3. Knowingly (a), concurs in making or publishing any written report, exhibit or statement of its affairs or pecuniary condition containing any material statement which is false, or (b), omits or concurs in omitting any statement required by law to be contained therein;   *   *   *

" Is guilty of a misdemeanor."

The purpose of section 47 is clear.   It was enacted for the protection of the public against being misled or deceived by false statements as to the financial condition of the corporations required to make annual reports to the Superintendent of Insurance.   Appellant was the president of State Title and Mortgage Company, an insurance corporation required by law to make annual reports to the Superintendent of Insurance.   Section 45 of the Insurance Law requires the Superintendent to cause to be " prepared and furnished " to companies required to report to him " printed forms of the reports and statements required " by him.   About the first of the year 1933, the title company submitted to the Superintendent of Insurance a statement which purported to show the financial condition of the company as of December 31, 1932.   The Insurance Department suggested changes and alterations.   Those changes were made by the company and on January sixteenth, the examiner in charge advised that the statement be accepted and filed.   Two days later it was officially acknowledged and placed on file.   It was in the form required by section 48 of the Insurance Law and showed the company's net surplus of assets over liabilities.   The statement filed was in form and wording as follows:

## State Title and Mortgage Company

### Statement of Condition December 31, 1932

Our Clients Hold 7,684 Mortgages, Guaranteed or in Certificates, Amounting to $69,899,491.60.

Resources:

| | | |
|---|---:|---:|
| Cash on Hand and in Banks | $558,376 | 16 |
| Accrued Interest | 1,616,520 | 74 |
| Loans Receivable | 2,537,256 | 41 |
| (Secured by collateral) | | |
| Bonds and First Mortgages | 4,091,698 | 54 |
| Stock Investments | 1,274,000 | 00 |
| Stock of State Banking Company | 2,562,303 | 08 |
| (Wholly owned) | | |
| Company's Office Buildings | 1,262,753 | 27 |
| (Unencumbered) | | |
| Subsidiary Real Estate Company | 652,440 | 11 |
| (Investment and advances) | | |
| Accounts Receivable | 2,426 | 76 |
| | $14,557,775 | 07 |

Liabilities:

| | | | |
|---|---:|---:|---:|
| Accounts Payable | | $5,298 | 03 |
| Agency Accounts | | 117,513 | 63 |
| Interest Received in Advance | | 59,739 | 08 |
| Interest Accrued | | 1,062,560 | 59 |
| Bills Payable (Secured) | | 4,143,890 | 93 |
| Mortgages Sold, Undelivered | | 55,650 | 00 |
| Reserves for Taxes, etc | | 445,917 | 09 |
| Reserve for Contingencies | | 2,500,000 | 00 |
| Capital | $1,000,000 00 | | |
| Surplus | 5,000,000 00 | | |
| Undivided Profits | 167,205 72 | | |
| | | 6,167,205 | 72 |
| Total | | $14,557,775 | 07 |

A copy of the statement was furnished to Dun and Bradstreet, also to Moody's Investors Service.

The statement was filed in the form usually used by companies and approved by the Insurance Department. It correctly stated the assets and liabilities of the company and gave the correct net balance. Nevertheless, appellant has been convicted for issuing that statement. How has that happened? While the State admits that the statement correctly reflects the book entries of the company and that such entries are accurate and in a form approved by the Superintendent of Insurance, still it urges that the form of the statement was misleading, false and tended to deceive. That contention is based upon two grounds: *First*, it is claimed that the item of "Cash on Hand and in Banks, $558,376.16," was misleading, as $400,000 included therein was not cash on hand or in bank as it consisted of a loan from the Brooklyn Trust Company to the title company made on December 29 or 30, 1932, evidenced by a certificate of deposit and the money was not available for use by the title company on December 31, 1932. *Second*, that the items "Bonds and First Mortgages, $4,091,698.54," was misleading, as a large part thereof had been pledged to the Reconstruction Finance Corporation, hereafter referred to as the R. F. C., also that the item "Stock of State Banking Company (wholly owned), $2,562,303.08," was misleading as that stock had also been pledged to the R. F. C. to secure the payment of loans and it is asserted that as the statement did not disclose such facts it was misleading and in effect false, and gave the impression that such securities were in fact in possession of the title company available for the payment of claims against it when in fact they were not in the possession of the title company and were not available for the payment of claims against it. The law does not require that a balance sheet shall give such details.

The testimony of the State's accountants indicates that at the time in question there was no uniform practice requiring the giving of such details. The statement was

prepared by the assistant to the comptroller of the title company in the usual way. Appellant did not participate in any way in its preparation. He did, however, verify the statement. The law required that the statement should show all of the assets of the title company and all of its liabilities. It does exactly that. It also shows the correct credit balance. True it is that it did not state that most of the credit items, excepting " Cash on Hand and in Banks " had been pledged to the R. F. C. to secure loans but the exact amount of such loans appeared on the debit side of the statement under the item " Bills Payable (Secured)." As the law required all assets of the title company to be stated on the credit side of the statement, it was perfectly apparent from the statement that the items " Bills Payable (Secured) " could only mean that the bills payable were secured by some of the assets listed on the credit side of the statement. In fact, there is testimony given by a witness called by the State, an accountant, that the word " Secured " placed after the item " Bills Payable " indicated that the bills payable were secured by the assets of the company at least to the full amount of the liability. It was perfectly lawful for the title company to borrow money from the R. F. C. and to secure the loans with collateral. We are unable to understand how in the circumstances it can be held that appellant willfully issued a false statement in so far as the R. F. C. loans are concerned.

As to the item " Cash on Hand and in Banks," appearing on the credit side of the balance sheet, a more detailed statement is required. Just prior to the close of the year 1932 the appellant had a conversation with the president of the Brooklyn Trust Company in which he stated in substance that the title company desired a loan of $400,000. The president of the trust company agreed to make the loan and instructed another officer of the trust company " to put the transaction through." The loan was made upon a demand note of the title company and a credit of $400,000 entered upon the books of the

bank in favor of the title company which delivered to the trust company 12,740 shares of 778 Park Avenue Construction Corporation stock as collateral security for the loan. The day the loan was made the trust company issued an advice of deposit, addressed to the title company as follows: " We have this day credited your account as follows: Demand loan $400,000." The title company made a proper entry upon its records showing the deposit of $400,000 to its credit by the trust company. The trust company on the same day on its records made an entry showing a demand loan of $400,000 to the title company. The transaction and entry on the books of the title company was the basis for including the $400,000 as part of the item of $558,376.16, appearing on the balance sheet as " Cash on Hand and in Banks." If that were all there was to the transaction, it could not be seriously urged that there was anything wrong about the transaction or the including of that amount, $400,000, in the item of " Cash on Hand and in Banks."

It appears, however, that certain employees of the trust company issued a thirty-one-day certificate of deposit for $400,000 in the name of the title company and retained the certificate in the trust company as security for the $400,000 loan. The certificate provided for thirty-one days' notice and had written on it the words " in safe-keeping."

From such fact, it is contended by the State that the $400,000 loan was a fictitious transaction and a sham; that the trust company did not have that $400,000 on hand in the bank; that it was not in its possession available for the business of the title company but was a mere fictitious book entry made for the purpose of enabling the title company to file a statement showing $400,000 more on hand or in bank than it actually possessed. It is also urged that the fact that the title company paid the loan and took up its note three days later tends to establish the fact that the loan was fictitious, made for the

purpose of deceiving the Superintendent of Insurance and the public.

If in fact the appellant verified the statement knowing that the $400,000 was not available for use by the trust company but that it simply had a ficititious cash entry of $400,000 under an agreement that it could not be drawn upon for use, then the statement that the title company had $558,376.16 " Cash on Hand and in Banks " was a false statement and in violation of section 47 of the Insurance Law, as such fund would not be actually possessed by it and available for the payment of losses and claims. It would also be in violation of section 665, subdivision 3, of the Penal Law, as it would constitute a " material statement which is false."

The question for determination narrows down to this, has the State proved beyond a reasonable doubt that on December 31, 1932, the $400,000 was not cash in bank, available for the use of the trust company for the payment of losses and claims and held for the protection of its policyholders or creditors and was the statement a material statement which was false?

In order to accept the State's contention, it is necessary to believe that appellant was engaged in a fraudulent transaction and that the officials of the trust company were parties to such fraudulent scheme. An apparently perfectly valid business transaction must because of certain collateral suspicious circumstances be branded as a fraud and a crime. And that in view of the fact that the burden was on the State to establish the fact beyond a reasonable doubt. We believe that the State has failed to sustain that burden. In appellant's conversation with the president of the trust company, it does not appear that there was anything said about a certificate of deposit. The evidence discloses a request by appellant to the president of the trust company for a loan of $400,000 and his agreement to make the loan. Standing alone, that would exclude the idea that the loan was to be evidenced by a certificate of deposit bearing a thirty-one-day notice.

The presumption would be that the amount of the loan would at once be available to the borrower. Borrowers do not ordinarily borrow money and secure the loan with collateral for the purpose of receiving a certificate of deposit with a thirty-one-day notice included and agree to pay a higher rate of interest than such certificate of deposit would bear. Not only did the conversation with the president of the trust company indicate a cash loan immediately available for use, but the records of the trust company and the title company including the loan book, the promissory note of the title company, the deposit entries and the loan card evidence a demand loan. That was the kind of loan negotiated by the appellant with the president of the trust company and that was the kind of a loan evidenced by the record entries and notice from the trust company to the title company.

Subordinate employees of the trust company prepared a certificate of deposit which did not reflect the agreement but was contrary to it. The appellant did not have knowledge of that fact. He had a right to rely on the agreement as made and as evidenced by the statement sent by the trust company to the title company. It cannot be reasonably contended that by relying on the facts disclosed to him and in verifying the statement prepared by the assistant to the comptroller of the title company he knowingly made a false statement or a statement intended to deceive the public. It is urged by the State that the fact that the loan was repaid on January 3, 1933, is evidence from which the jury might reasonably have inferred that the loan was not needed but was negotiated for some improper purpose. We believe that fact is insufficient to overcome the presumption of innocence and establish the defendant's guilt beyond a reasonable doubt.

It appears that the title company was obligated to pay over $400,000 due its creditors for interest on January first; that its bank account was overdrawn and that it was in need of funds to pay the interest to become due on

January first, and which it actually paid to the amount of $431,779.65. It was in the habit of borrowing money just before each interest due date and repaying it thereafter as it collected interest due it. There was nothing unusual or illegal about that.

It is also suggested that reason existed for the prompt payment of the loan because of the discovery of the fact that the certificate of deposit had been issued contrary to the agreement. Whatever the reason for paying the loan so promptly may be, the fact that it was paid does not establish the guilt of the defendant beyond a reasonable doubt.

As we have reached the conclusion upon the merits that the judgment of conviction must be reversed, it is unnecessary to discuss the various exceptions called to our attention by the appellant.

The judgment should be reversed and the indictment dismissed.

FINCH, J. (dissenting in part). John A. Dilliard, the appellant, president of the State Title and Mortgage Company, was convicted of violating section 47 of the Insurance Law and section 665, subdivision 3, of the Penal Law. In substance these sections make it a misdemeanor knowingly to make or publish a false statement as to the financial condition of a corporation (§ 665) or to represent that certain assets are in the possession of the corporation which are not actually possessed by it. As part of the indictment the appellant was charged with issuing a statement of condition, dated December 31, 1932, which showed the State Title and Mortgage Company to possess $400,000 in cash more than it actually had. The facts disclosed at the trial as to this item are as follows.

On December 30, 1932, the day before the date of the statement of condition, the State Title and Mortgage Company had $145,105 cash on hand and in banks, of which a considerable portion was held by it as agent

and only $9,908.68 of which was general funds. On that day the appellant telephoned the president of a trust company and arranged for a loan of $400,000. The exact terms of the loan are not directly available. The president could not, at the time of trial, recollect the conversation except that he had given instructions to one Barnewall about the loan. The appellant himself, although he had previously characterized the transaction as merely " window dressing " refused to take the stand and he was joined in this refusal by Mr. Skiffington, the vice-president of the State Title and Mortgage Company, who signed the note. On the day of the loan a time certificate of deposit was issued providing that thirty-one days of notice had to be given prior to the withdrawal of the money. This certificate of deposit was never delivered to the State Title Company but was retained by the trust company and had marked on it the words " in safe keeping only." The signature of Barnewall, to whom the president had given instructions, also appears on the face of the certificate of deposit. On January 3, 1933, the first business day after December 31, 1932, the loan of $400,000 was immediately repaid. Thereafter between January 10, 1933, and January 17, 1933, statements of condition of the State Title and Mortgage Company *as of December 31, 1932*, were made out and sent to the State Insurance Department. Annexed to the final statement of condition of January 16, 1933, is an affidavit of the appellant wherein he swears that he supervised the preparation of the statement. Over 3,000 copies of the statement were subsequently made and copies were sent to Moody's Investors Service and to Dun and Bradstreet.

The contention of the State is that the alleged loan was a sham and colorable transaction, that it was made for the purpose of misleading the public and furnishing an entirely false picture of the financial condition of the State Title and Mortgage Company, and that the appellant Dilliard knowingly issued the false statement.

Two questions are presented: *First*, are the statutes, under which the appellant has been convicted, intended to apply to such transactions as the one here alleged, where the statement of condition seemingly reflects a transaction that took place? *Secondly*, was the evidence submitted by the State such that a jury would not be justified in finding the defendant guilty beyond a reasonable doubt?

As to the first question, the clear purpose of the statute is to compel a statement deliberately issued to the public to record the facts truthfully. It is not to be defeated by the juggling of figures or by bookkeeping legerdemain. If a transaction is created to inflate values falsely and so to mislead and defraud the public, the ostensible " correctness " of a bookkeeping entry, which records the transaction, does not serve to redeem the falsity of a statement of condition knowingly issued thereon. The pretense of truthful recordation cannot prevail over the basic falsity of the statement. So in the case at bar, if $400,000 were borrowed with the intent or under such restrictions and an agreement that the money was not to be available or used, and the entry was for the purpose only of apparently inflating the cash resources of the corporation, then the transaction was a violation of both statutes under consideration.

We turn, therefore, to the second question — has the State presented sufficient evidence to warrant the finding of the jury that the transaction was colorable and that Dilliard was implicated therein? The exact terms of the loan are not available from the testimony of either party. The president could not recollect; the appellant refused to testify save his characterization of the transaction before a Moreland Commissioner as for the purpose of " window-dressing." We must depend, therefore, on the other facts in the case plus appellant's own admission. It is undeniable that the money was borrowed the day

before the date of the statement of condition and repaid the day after. Not only was it untouched during that period, but it was not available for use if the State Title and Mortgage Company had desired to use it. The certificate of deposit provided that the money could not be withdrawn without thirty days' notice; it was never delivered to the corporation but was retained by the trust company; and indeed had marked on it " for safe keeping." From all this the jury could infer what had transpired, for " there is no surer way to find out what the parties meant, than to see what they have done." (*Insurance Co.* v. *Dutcher*, 95 U. S. 269, 273.) There are claims that the blame should be placed on the subordinate employees who, it is suggested, may have acted without authority, although there is nothing in the record to substantiate this. It was well within the province of the jury to determine whether a subordinate employee of a bank with no motive and without authority would proceed to tamper with a loan of nearly half a million dollars. In addition we have the added fact that the signature of the employee to whom the president gave instructions concerning the loan appears on the restricted certificate. Why was he not called to substantiate this defense if it in fact existed? It is asserted that the transaction was valid since the statement of condition was approved by the State Insurance Department. The Insurance Department, however, need not determine the validity of the report but need only make certain that such report is filed. Certainly the Legislature has not given to the Superintendent of Insurance the authority to grant a dispensation from the punishment for a breach of the statute.

All these facts present ample proof to bring the case well within the province of the jury and justify their inference of the nature of the transaction. But as if to fix the guilt beyond peradventure we have the testimony of the admission of appellant himself in this connection, as already pointed out. When interrogated

before a Moreland Commissioner, he himself said that the transaction was for purposes of " window-dressing," that is for the purpose of representing the assets of the corporation to be other than they were.

Upon this record the guilt of appellant is clear. Practices such as here presented should not readily be condoned. The complexities of the operation must not be allowed to obscure its illegality. Large aggregations of capital have their great community benefits but great benefits carry equally great obligations, not the least of which is that they must be headed by executives who know and practice character and honesty. Otherwise the consequences often are disastrous and far reaching. I am unable to agree that it can be said that there was no evidence to justify the jury in finding the defendant guilty beyond a reasonable doubt.

With regard to the items dealing with the listing of the pledged securities I concur with the majority, but in relation to the listing of the $400,000 as cash on hand or in banks, the judgment of conviction should be affirmed.

CRANE, Ch. J., LEHMAN and LOUGHRAN, JJ., concur with HUBBS, J.; FINCH, J., dissents in opinion, in which O'BRIEN and CROUCH, JJ., concur.

Judgment reversed, etc.